NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0378n.06

Case No. 15-1844

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 06, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DEBRA RUCINSKI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| COUNTY OF OAKLAND; SARAH | ) | MICHIGAN |
| MCCANN; S BELTZ, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____/

Before: MERRITT, BATCHELDER, and GILMAN, Circuit Judges

**MERRITT, Circuit Judge.** This is a 42 U.S.C. § 1983 suit by the estate of Jeremy Rucinski, a young man who suffered from schizophrenia and other mental-health conditions. Oakland County Deputy Sheriff Sarah McCann shot and killed Rucinski in his garage as he approached her while brandishing a switchblade knife. The representative of Rucinski's estate asserts Fourth Amendment and Michigan state law claims against McCann and Deputy Sheriff Sharon Beltz and a municipal liability claim against Oakland County. The district court granted the defendants' motion for summary judgment, finding that McCann and Beltz acted reasonably as a matter of law in using force against Rucinski. Because we are constrained by our case law requiring a so-called "segmented approach" to our evaluation of officers' use of force, we

**AFFIRM** the district court's grant of summary judgment to McCann, Beltz, and Oakland County.

## I. Facts

Jeremy Rucinski suffered from multiple mental-health conditions, including bipolar disorder, schizophrenia, and paranoid behavior. On the afternoon of January 6, 2013, Rucinski approached his girlfriend Rebecca Vandenbrook in the bedroom of their home and asked her for his cigarettes. Vandenbrook refused to disclose the location of Rucinski's cigarettes and suggested that Rucinski keep smoking his electronic cigarette instead. In response, Rucinski yelled at Vandenbrook, pulled a switchblade knife from his pajama pants pocket, opened the blade, and demanded his cigarettes. Vandenbrook told Rucinski where his cigarettes were and, after Rucinski had left the room, she shut the bedroom door, retreated to the adjoining bathroom, and called 911. Vandenbrook told the 911 operator that Rucinski was "schizophrenic and [] [was] having a breakdown"; that Rucinski had a switchblade knife in his possession; that Rucinski was alone in the garage; and that Rucinski needed to go to the hospital because she was worried that he might hurt himself.

In response to Vandenbrook's call, Oakland County Deputy Sheriffs Sarah McCann, Sharon Beltz, Eric Rymarz, and Drakkar Eastman drove to Rucinski and Vandenbrook's home in order to conduct a "welfare check." The deputies learned from dispatch that there was a schizophrenic individual in the house's garage who had a knife in his possession. Upon their arrival at Rucinski's house, McCann and Beltz walked up the driveway towards the garage, which was connected to the home, while Rymarz and Eastman went to the front door of the home. The deputies never developed a plan as to how they would handle the situation with Rucinski.

Vandenbrook opened the front door for Rymarz and Eastman, and allowed the two deputies to enter the residence. Vandenbrook told Rymarz and Eastman that Rucinski was in the garage; that Rucinski "usually carrie[d] a switchblade knife"; and that Rucinski "was off his meds and [Vandenbrook] was concerned about him." Vandenbrook then led Rymarz and Eastman to the door that served as the interior entrance to the garage so that Rymarz could open the garage door and give McCann and Beltz access to Rucinski "[i]n case things went south." Rymarz opened the interior door without knocking or identifying himself, and he then pressed the button to open the garage door. Rymarz and Eastman then began to walk down a short flight of stairs to the floor of the garage.

As the overhead garage door opened, the deputies spotted Rucinski in the far-back corner of the garage, and Beltz entered the garage between two parked cars with her taser drawn in order to speak with Rucinski. McCann, who had previously drawn her firearm, acted as "cover" for Beltz and took only a few steps into the garage.

Rymarz initiated contact by calling out Rucinski's name, saying "Jeremy, Jeremy." Rucinski looked at Rymarz, reached into his pocket, pulled out and opened his switchblade knife, said "bring it on" or "here we go," and began walking towards McCann. McCann took a few steps backwards and moved out of the garage, but she had to stop after retreating "a couple of feet" because the driveway was icy and slippery. Rucinski refused to comply with the deputies' commands that he "[d]rop the knife," approaching to within five feet of McCann while still brandishing the knife.

At this point, Beltz, who remained between the two cars parked inside the garage, believed McCann was in "danger" and fired her taser at Rucinski. McCann discharged her firearm at Rucinski a split-second later, hitting him in the chest with a single deadly shot. The

deputies immediately administered first aid to Rucinski, and Rucinski was transported to Genesys Hospital where he was pronounced dead. McCann later testified that she was not aware that Beltz had already fired her taser at Rucinski when she discharged her firearm.

Debra Rucinski, the personal representative of Jeremy Rucinski's estate, subsequently filed this 42 U.S.C. § 1983 suit against McCann, Beltz, and Oakland County. She claims that the deputies violated the Fourth Amendment and Michigan state law by using excessive force against Rucinski. Rucinski also asserts a 42 U.S.C. § 1983 claim against Oakland County for failure to train, hire, or supervise its employees adequately. After discovery, the district court granted the defendants' motion for summary judgment and dismissed all of Rucinski's claims. Rucinski now appeals to this Court for reversal.

## II. Fourth Amendment Claim

Rucinski argues that McCann and Beltz used excessive force against Rucinski in violation of the Fourth Amendment. The district court found that McCann and Beltz were entitled to qualified immunity because they acted reasonably as a matter of law when they used force against Rucinski. We review the district court's grant of qualified immunity *de novo*. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

Qualified immunity shields government officials from liability for civil damages insofar as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity "ordinarily applies unless it is obvious that [a] reasonably competent official would have concluded that the actions taken were unlawful," *Chappell*, 585 F.3d at 907, and it affords "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or

those who knowingly violate the law,'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

The plaintiff must demonstrate that the defendants are not entitled to qualified immunity. *Chappell*, 585 F.3d at 907. Consequently, the plaintiff bears the burden of showing that, when the evidence is viewed in a light most favorable to him: (1) a constitutional right was violated; and (2) that right was clearly established at the time of the violation. *Id.* If the plaintiff fails to demonstrate either that a constitutional right was violated or that the right was clearly established, he has failed to carry his burden. *Id.* Courts have discretion to decide which of the "two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Here, the district court determined that McCann and Beltz were entitled to qualified immunity because their use of force was reasonable under the Fourth Amendment.

The proper application of the Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This is an objective test, to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The evaluation of reasonableness must also recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

An officer's use of deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). We have said that "[w]hen a person aims a

weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011).

The district court properly determined that McCann and Beltz are entitled to qualified immunity because they acted reasonably as a matter of law in using force against Rucinski. When assessing the relevant facts and drawing all inferences in Rucinski's favor, as we must, it is undisputed that Rucinski pulled a switchblade knife out of his pocket, opened the blade, said "here we go" or "bring it on," began moving towards McCann, disregarded the deputies' repeated orders to drop the knife, and approached to within five feet of McCann while brandishing the knife in his outstretched hand. At this point, Beltz believed that McCann was in "danger" and fired her taser at Rucinski. A split-second later McCann, who could retreat no farther, fired a single deadly shot at Rucinski.

Our holdings in *Chappell*, 585 F.3d at 911, *Gaddis v. Redford Township.*, 364 F.3d 763, 776 (6th Cir. 2004), and *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991), confirm the district court's judgment that McCann and Beltz acted reasonably as a matter of law in using force against Rucinski when he approached to within five feet of McCann while brandishing a knife. Our prior decisions in *Chappell*, 585 F.3d at 911, and *Rhodes*, 945 F.2d at 118, are most directly on point. In *Chappell*, where detectives shot and killed a fifteen-year-old boy after he moved to within seven feet of them while holding a steak knife over his head, we held that the detectives' use of deadly force was reasonable as a matter of law, 585 F.3d at 911. Similarly, we held in *Rhodes* that an officer acted reasonably as a matter of law when he shot and killed a suspect brandishing a knife after the suspect did not comply with commands to drop the knife and approached to within four feet of the officer, 945 F.2d at 118. Thus, the implication of

*Chappell* and *Rhodes*: McCann acted reasonably as a matter of law in using deadly force against Rucinski when he approached to within five feet of her while wielding a knife. And of course, these precedents also establish that Beltz acted reasonably as a matter of law when she deployed *non-lethal* force (her taser) against Rucinski.

Rucinski makes two arguments to try to fend off this conclusion. First, Rucinski argues that this case is distinguishable from *Chappell*, *Gaddis*, and *Rhodes* because the deputies here were conducting a welfare check on a mentally ill man, whereas the officers in those cases were confronting criminal suspects. But Rucinski identifies no case law restricting an officer's ability to use deadly force when she has probable cause to believe that a mentally ill person poses an imminent threat of serious physical harm to her person; indeed, out of circuit case law weighs against this argument. *See, e.g.*, *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) (quoting *Bates ex rel. Johns v. Chesterfield County, Va.*, 216 F.3d 367, 372 (4th Cir. 2000)) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves . . . when faced with threatening conduct by the disabled individual.").

Next, Rucinski asks us to ignore our "segmented approach" to analyzing Fourth Amendment excessive force claims, whereby we are required to evaluate the reasonableness of officers' use of force by focusing on the moments immediately preceding that use of force, *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007), and not on the adequacy of planning or the length of time spent thinking through the problem at hand. Rucinski asks us to consider instead whether the deputies' lack of full investigation, poor planning, and alleged bad tactics in initiating contact with Rucinski either provoked Rucinski or created the circumstances that led to Beltz and McCann's use of force. Rucinski argues that we should abandon the "segmented approach" because it improperly operates to protect officers that proactively create a

need for force that would not have otherwise existed, and reminds us that other circuits have adopted approaches that scrutinize whether officers created a provocation or other circumstances that led to officers' subsequent use of deadly force. *See, e.g.*, *Billington v. Smith*, 292 F.3d 1177, 1190-91 (9th Cir. 2002) ("[I]f . . . an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise *reasonable* use of force *unreasonable* as a matter of law.") (emphasis in original).

Although this may present a close question and send more excessive force cases to the jury for trial, *see, e.g.*, *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 22 (1st Cir. 2005) (stating that jury properly considered "events leading up to the shooting" in an excessive force case), we may not disregard this Court's long-standing practice of analyzing excessive force claims in segments. *See, e.g.*, *Lubelan*, 476 F.3d at 406 ("The proper approach under Sixth Circuit precedent is to view excessive force claims in segments."); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996) (using the segmented approach to analyze an excessive force claim). And in any event, even if we were able to consider whether the deputies, through their lack of planning and alleged bad tactics in initiating contact with Rucinski, created circumstances that led to McCann's use of deadly force, the Supreme Court has recently weighed in on this very issue, stating that plaintiffs "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. —, 135 S. Ct. 1765, 1777 (2015) (internal quotation marks omitted) (applying without adopting the Ninth Circuit law in *Billington*, 292 F.3d at 1190).

Finally, because neither McCann nor Beltz violated Rucinski's Fourth Amendment rights, we also must dismiss Rucinski's municipal-liability claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (stating that no case authorizes "the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm").

### III. Michigan State-Law Claims

Rucinski asserts two state-law claims against McCann and Beltz—that McCann and Beltz committed assault and battery when they used force against Rucinski in the garage; and that McCann and Beltz were grossly negligent when they cornered Rucinski in the garage and used force against him. The district court granted summary judgment to McCann and Beltz on both claims. We review the district court's grant of summary judgment *de novo*. *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 486 (6th Cir. 2006).

First, Rucinski claims that McCann and Beltz committed assault and battery when they used force against Rucinski in the garage. In defense, McCann and Beltz argue that they are entitled to immunity from Rucinski's claim. Under Michigan law, a police officer who relies on immunity as an affirmative defense from a suit alleging an intentional tort bears the burden of raising and proving his immunity. *Latits v. Phillips*, 826 N.W.2d 190, 194 (Mich. Ct. App. 2012) (citing *Odom v. Wayne County.*, 760 N.W.2d 217, 227 (Mich. 2008)). To establish immunity, the officer must show:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in *good faith*, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Odom*, 760 N.W.2d at 228 (emphasis added). Rucinski appears to concede that McCann and Beltz have met the first and third prongs of this test, arguing only that McCann and Beltz are not entitled to immunity because their use of force against Rucinski was not undertaken in good faith.

In order to establish that she acted in "good faith," an officer must establish that she "acted without malice." *Id.* at 225. Michigan courts have explained that the "good faith" requirement "is subjective in nature" and "protects a[n officer's] honest belief and good-faith conduct with the cloak of immunity while exposing to liability a[n officer] who acts with malicious intent." *Latits*, 826 N.W.2d at 195. Therefore, "[a]s long as [the officer] can show that he had a good-faith belief that he was acting properly in using deadly force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief." *Id.*

Both McCann and Beltz have presented undisputed evidence that they acted in good faith and without malice in using force against Rucinski. In her deposition, McCann testified that the deputies' "goal" in responding to Vandenbrooks's 911 call was to "try and establish communication" with Rucinski and "potentially" take him to the hospital. Both deputies have also presented undisputed evidence that they used force against Rucinski only because Rucinski posed an imminent risk of serious harm to McCann.

Rucinski also claims that McCann and Beltz were "grossly negligent when they cornered Rucinski in the garage and used force against him, even though they knew he was experiencing a mental breakdown." McCann and Beltz are entitled to summary judgment on this claim because Michigan law does not allow Rucinski to recast an assault and battery claim as a gross negligence claim.

Michigan courts have repeatedly rejected plaintiffs' "attempts to transform claims involving elements of intentional torts into claims of gross negligence." *Johnson ex rel. Steward v. Driggett*, No. 306560, 2013 WL 375701, at *8 (Mich. Ct. App. Jan. 31, 2013) (quoting *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004), *overruled in part on other grounds by Odom*, 760 N.W.2d at 224 n.33); *see also Latits*, 826 N.W.2d at 197 (rejecting plaintiff's gross negligence claim because the claim was "one of an intentional tort, and no amount of artful pleading can change that fact"). For example, in *Latits*, the plaintiff claimed that an officer who had intentionally shot a criminal suspect was grossly negligent because the officer had, among other things, failed to follow proper police procedures during the encounter, 826 N.W.2d at 196. The Michigan Court of Appeals rejected the gross-negligence claim, stating that:

> Negligence might have been the proper claim if [the officer] had unintentionally pulled the trigger or if [the officer] had been aiming at a different target but accidentally shot Latits instead. But there was nothing negligent or reckless about [the officer's] decision to point his firearm at Latits and shoot—he did so intentionally.

*Id.*

Rucinski's gross negligence claim fails because it is premised on the deputies' *intentional* decision to use force against Rucinski. There is no evidence in the record casting doubt on whether McCann and Beltz's use of force was anything but intentional. Rucinski seems to concede this point and instead argues that the deputies' lack of planning and alleged bad tactics in initiating contact with Rucinski still make McCann and Beltz liable for gross negligence. This argument misses the mark because the deputies' alleged bad tactics are not relevant to the question of whether McCann and Beltz's decision to use force was intentional. *See Latits*, 826 N.W.2d at 196 ("[A]ny failure to follow [proper police] procedures would potentially be

relevant to the correctness of the decision to shoot, but not whether that decision was intentional.").

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.