**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0650n.06

**Case No. 16-5403**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 05, 2016

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KIMBERLY BELL, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellant, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| v. | ) | |
| | ) | |
| CUMBERLAND COUNTY, TENNESSEE, et al., | ) | O P I N I O N |
| | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE:** McKEAGUE, KETHLEDGE, and STRANCH, Circuit Judges.

**McKEAGUE, Circuit Judge.** Plaintiff Kimberly Bell, administratrix of the estate of her brother, David Lee Fish, brought this § 1983 action after Fish was shot and killed during an altercation with Cumberland County Deputy Sheriff Jonathan Human. What began as a routine trespassing call escalated into a situation necessitating Deputy Human's use of deadly force to protect himself from Fish's violent attack. Because we find no fault in the district court's conclusion that Fish posed an immediate, serious threat of harm to Deputy Human, we hold that Deputy Human's use of deadly force was not excessive. Additionally, we uphold the district court's ruling that Deputy Human was not deliberately indifferent to Fish's medical needs in the aftermath of the shooting. We therefore agree with the district court that Fish's constitutional rights were not violated and affirm summary judgment for defendants.

**I**

David Fish and Cynthia Franklin had a tumultuous relationship punctuated by episodes of domestic abuse by Fish. The police had been called to Franklin's residence in Crossville, Tennessee, on numerous occasions. On October 12, 2012, Cumberland County Deputy Sheriff Jonathan Human responded to a call that Fish had been knocking on Franklin's doors and windows before running off. Although Fish had left the premises by the time he arrived, Deputy Human located him nearby, warning him that he would be arrested for trespassing were he to return.

Despite this warning, Fish returned to Franklin's residence two days later—on October 14—and Deputy Human was once again dispatched to the scene. According to Franklin, prior to Deputy Human's arrival, she had been home alone when Fish began incessantly rapping on her outside windows. Although Franklin attempted to hide, Fish was not deterred and eventually let himself in through the unlocked garage door, at which point he grabbed a knife and meat cleaver and informed her that they were "both going to die that day." At that time, Franklin phoned her father-figure, Lysle Shields, and warned him not to come home; concerned, Shields called 911.

Shortly thereafter, Deputy Human arrived. Fish directed Franklin to answer the door and "get rid of [the police]." Franklin informed Deputy Human that, although Fish was there, she was "OK"; to Deputy Human, though, Franklin appeared visibly upset. As Deputy Human was leaving, he noticed Fish standing at the edge of the nearby woods. Given the well-known history of the couple's domestic discord, as well as the fact that Fish was trespassing on Franklin's property, Deputy Human called over to Fish, asking to speak with him. Fish took off running and disappeared.

After searching unsuccessfully for Fish in the yard surrounding the home, Deputy Human returned to Franklin's residence where, according to Deputy Human, Franklin "let [him] in" by opening the door, stepping aside, and pointing Deputy Human to the basement, where Fish had retreated in hiding.[1]  Deputy Human immediately spotted Fish in the corner of the dimly lit basement amid piles of clothes and a clutter of other objects.  He ordered Fish to show his hands and drew his weapon in the process.  Fish complied and, since his hands were empty, Deputy Human re-holstered his gun.  Deputy Human then told Fish the two needed "to go upstairs to talk."

Fish refused to obey orders and likewise ignored Franklin's pleas to cooperate.  Instead, Fish became "agitated" and assumed a "fighting stance."  He then "lunged" at Franklin, at which point Deputy Human deployed his pepper spray, although it had no effect on Fish and was eventually knocked from his hands.  In a second attempt to contain Fish, Deputy Human grabbed his arm.  Fish responded by tackling Deputy Human and driving him backwards into a steel pole.

The struggle continued on the ground.  Deputy Human testified that he attempted to get up, but Fish "kept pulling me down toward him.  He was hitting me in the sides and the back of my head with something."  According to Franklin, "[Fish] was beating the hell out of Officer Human and Officer Human could not see."  In his third attempt to ward off Fish, Deputy Human grabbed his baton, but Fish once again batted it away.  At this point, Fish was sitting on top of Deputy Human's chest, and Deputy Human was "black[ing] in and out" of consciousness.  Fish then attempted to reach for a cast iron skillet lying nearby.  *See* R. 32, Franklin Dep. at 66, PID 368 ("David picked up the iron skillet . . . He's trying to hit Officer Human with it.").  Deputy Human "knew if [Fish] got [the skillet], he would beat [him] to death with it."  R. 33, Human

---

[1] Deputy Human testifies that he assumed Franklin's consent to enter her home based on her body language, a fact Plaintiff does not dispute on appeal.

Dep. at 86, PID 566. When Fish was reaching for the skillet, Deputy Human was able to un-holster his gun and fired at Fish "until [Fish] stopped attacking [him]." *Id.* at 88, 151, PID 568, 631; *see also* R. 32, Franklin Dep. at 146, PID 448 ("[H]e didn't start shooting until—he had tried and tried to get out from under David.").

In the immediate aftermath, Deputy Human found himself largely incapacitated. Deputy Human was in severe pain, his vision was blurry, and Fish was lying across his legs. However, he was still able to radio for help and instruct Franklin to call 911. Police from the Cumberland County Sheriff's Department arrived at the scene shortly thereafter, handcuffed Fish, and had him transported to Cumberland Medical Center, where he was pronounced dead on arrival. Deputy Human was also treated for rib contusions and a concussion. The Tennessee Bureau of Investigation (TBI) conducted a review of the incident, concluded that Deputy Human acted in accordance with established principles and protocols, and no disciplinary action was taken.

A year later, Kimberly Bell, Fish's sister, brought suit under 42 U.S.C. § 1983 against Cumberland County, Sheriff Butch Burgess, and Deputy Sheriff Jonathan Human. She alleged that Deputy Human violated Fish's constitutional rights in numerous ways, including, as relevant here, that he used excessive force and failed to render adequate medical treatment in contravention of the Fourth and Fourteenth Amendments, respectively. Further, Bell brought claims against the County and Sheriff Burgess for failure to hire, train, and supervise its officers, as well as various state law claims. The district court consolidated the claims and disposed of them in full. *See Bell v. Cumberland Cty., Tenn.*, No. 2:13-cv-0104, 2016 WL 778046 (M.D. Tenn. Feb. 29, 2016). Pertinent to this appeal, the district court found that no constitutional violations had occurred and that Deputy Human was entitled to qualified immunity. *Id.* at *4–8.

It subsequently granted judgment in favor of Cumberland County and the Sheriff on that basis, noting that the claims against them also failed on the merits. *Id.* at *8–10.

Plaintiff's appeal followed. We affirm since no reasonable juror could find that Deputy Human violated Fish's constitutional rights.

**II**

We review the district court's grant of summary judgment de novo, recognizing that summary judgment is only proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gradisher v. City of Akron*, 794 F.3d 574, 582 (6th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).

Section 1983 imposes civil liability on individuals who, acting "under color of state law," deprive a citizen of his constitutionally protected rights. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 485 (6th Cir. 2007). However, the doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In other words, qualified immunity applies "unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2007). The doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

Once a qualified immunity defense has been raised, the plaintiff bears the burden of overcoming it by demonstrating both (1) that the official's conduct violated a constitutional right, and (2) that the right was clearly established at the time of the violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236. Courts can

address either prong first, and if a plaintiff is "unable to establish sufficient facts to support a finding of a constitutional violation by the defendant, the inquiry ceases, and the court must award judgment to the defendant." *Williams*, 496 F.3d at 485.

Plaintiff alleges that Deputy Human violated Fish's Fourth Amendment right to be free from excessive force when he shot and killed David Fish and his Fourteenth Amendment right to receive adequate medical care in the aftermath of the shooting. Each right is discussed in turn, but neither has merit; therefore, we do not reach the second prong of the qualified immunity analysis. *See Chappell*, 583 F.3d at 916 n.2; *see also Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005) ("We do not reach the [clearly established inquiry] because no rational juror could find that Officer Kopronica violated Ronnie's rights on the facts supported by the Rule 56 evidence.").

## A. Fourth Amendment Excessive Force

Plaintiff's Fourth Amendment claim is analyzed under an objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). In determining whether a use of force is reasonable, courts engage in a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. To aid in this analysis, we consider (1) the severity of the

crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.*

When a case involves the use of deadly force, the same balancing test is applied; however, the use of force will be deemed reasonable when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. at 7. Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" given that officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Taking all of this together, plaintiff's excessive force claim requires a showing that Deputy Human's use of deadly force was objectively unreasonable. *Chappell*, 585 F.3d at 908. At the outset, we note that *both* Deputy Human and Cynthia Franklin—the only two remaining witnesses from the scene—testified 1) that Fish was the aggressor; 2) that Deputy Human was rightly in fear for his life; and that 3) his last chance to save himself and Franklin was to use his weapon. This evidence, being undisputed, is enough to end the inquiry because it establishes that Fish "pose[d] a serious threat of physical harm" and that the use of deadly force was therefore reasonable. *Garner*, 471 U.S. at 7.

But the *Graham* factors support this conclusion as well. First, as to the severity of the crime at issue, while Fish was merely trespassing when Deputy Human first arrived, the unprovoked aggravated assault that he subsequently unleashed undoubtedly entitled Deputy Human to protect himself. *See, e.g.,* R. 32, Franklin Dep. at 69, PID 371 ("Human was just basically trying to survive."). Second, Fish posed an immediate threat of harm to Deputy

Human. The undisputed facts demonstrate that in the moments preceding the shooting, Fish had pinned Deputy Human to the ground, was delivering continuous blows to his head and ribs, and was about to strike him with a cast iron skillet, which would have inflicted serious—if not deadly—harm. *See Rucinski v. City of Cleveland*, No. 15-1844, 2016 WL 3613396, at *3 (6th Cir. July 6, 2016) ("[W]hen a person aims a weapon in the police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death.") (internal quotation marks omitted); *Davenport v. Causey*, 521 F.3d 544, 552–53 (6th Cir. 2008) (finding that "closed-fisted blows . . . may constitute deadly force" especially when directed at the head) (internal quotation marks omitted).

Moreover, Deputy Human had exhausted all other options. He had attempted to negotiate, deploy his pepper spray, and restrain Fish first with his hands and later his baton, all to no avail. Deputy Human resorted to his last available weapon—his gun—to save himself. In fact, the record makes clear that "'if [Deputy Human] had hesitated [in shooting Fish] . . ., [he] would have been . . . vulnerable to serious or even fatal injury.'" *Steele v. City of Cleveland*, 375 F. App'x 536, 542 (6th Cir. 2010) (quoting *Chappell*, 585 F.3d at 911). Deputy Human's "split-second decision" to use his firearm in this "tense, uncertain, and rapidly evolving" situation was reasonable. *See Graham*, 490 U.S. at 397; *see also DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 425 (6th Cir. 2006) (finding deadly force justified when a suspect advances on an officer with a motion threatening to inflict harm).

Finally, Fish was not merely trying to resist Deputy Human's orders, but was in fact actively attacking him. And resistance alone is enough to "increase[] the weight that must be given to the state's interest in a deadly-force seizure." *Untalan*, 430 F.3d at 317; *see also Davenport*, 521 F.3d 544, 551 (6th Cir. 2008) (concluding that "[m]ore force is also proper,

which could include deadly force, if the suspect was fighting with the police"). Fish's demeanor was angry and aggressive, despite the fact that Deputy Human was only trying to talk to him. *Davenport*, 521 F.3d at 533; *see* R. 32, Franklin Dep. at 136, PID 438 ("[Deputy Human] wasn't being mean or nothing or aggressive toward David.").

To rebut this showing of reasonableness, plaintiff emphasizes (1) that Deputy Human instigated the encounter by pursuing Fish when he first saw him in the woods; and (2) that the number of bullets fired by Deputy Human was "gratuitous." As to the first point, it was entirely reasonable for Deputy Human to pursue Fish considering the numerous warning signs of what appeared to be a dangerous situation. The precise reason he was dispatched to Franklin's home was because Fish—a man known for being physically abusive towards Franklin—was reported to be trespassing on her property. Further, Deputy Human thought Franklin looked "upset" and "like she had been crying" when he arrived. R. 33, Human Dep. at 135, PID 615. And contrary to plaintiff's assertion that "Deputy Human cornered [Fish] in the basement," both Deputy Human and Franklin testified that it was Fish—not Deputy Human—who was the initial aggressor. Finally, Plaintiff's argument has no bearing on the reasonableness of the force ultimately used. *See Rucinski*, 2016 WL 3613396, at *4 ("[P]laintiffs 'cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'") (quoting *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015)); *see also Chappell*, 585 F.3d at 909 (recognizing that, per the segmented analysis, it is only officers' actions "immediately prior to using deadly force" that factor into the reasonableness analysis).

With regard to plaintiff's second point, the record suggests that twelve shots were fired, with five rounds hitting Fish's body. But once again, Deputy Human testified—and Franklin

corroborated—that he ceased firing as soon as Fish was no longer a threat. *See* R. 33, Human Dep. at 151, PID 631 ("I fired [my weapon] until [Fish] stopped attacking me"); R. 32, Franklin Dep. at 70, PID 372 ("[H]e kept firing because David would not let up. And the last shot that he fired, David just went still . . . ."). "'[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.'" *See Krause v. Jones*, 765 F.3d 675, 681 (6th Cir. 2014) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014)).

There is "[n]o doubt the use of deadly force by police officers is a serious matter and ought to be avoided—but not at all costs and not in all situations." *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 154 (6th Cir. 2013). This is one of those unfortunate situations where deadly force was necessary given the serious and immediate threat of harm that Fish posed. As the district court found, "there simply is no competent evidence to create a jury question on whether Deputy Human's actions were objectively reasonable." *Bell*, 2016 WL 778046, at *6.

**B. Fourteenth Amendment Failure to Render Medical Care**

Plaintiff's sole reference to this claim comes in her Statement of Facts, with the sensationalized remark that Deputy Human "let Mr. Fish bleed in front of him without rendering any type of medical aid or attention." Although plaintiff has likely waived this argument, *see Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) (concluding that arguments "adverted to in only a perfunctory manner, are waived"), we also note that it fails on the merits.

Plaintiffs may bring § 1983 claims under the Fourteenth Amendment if government officials demonstrate "deliberate indifference to [the] serious medical needs" of those individuals they have apprehended. *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008); *City of*

*Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Proving deliberate indifference requires a plaintiff (1) to show the existence of a "sufficiently serious" medical need (the objective component); and (2) to allege facts that, if true, would demonstrate that the official "perceived facts from which to infer substantial risk to the [individual], that he did in fact draw the inference, and that he then disregarded that risk" (the subjective component). *Phillips*, 534 F.3d at 539–40 (internal quotation marks omitted). An official exhibits deliberate indifference, for example, if he "intentionally den[ies] or delay[s] access to medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). On the other hand, an officer's actions comport with the Due Process Clause if he "promptly summon[s] the necessary medical help." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097 (6th Cir. 1992).

Here, contrary to Plaintiff's assertions, the undisputed record shows that, rather than disregarding Fish's injuries, Deputy Human took steps to get help even in an incapacitated state. *See* R. 33, Human Dep. at 152, PID 631 ("I told [Franklin] that I couldn't see very well . . . ."); *see also id.* at 154, PID 634 ("I tried to get up, but I couldn't. I tried to stand up or sit up, but I couldn't get up."). He immediately radioed the sheriff's department and instructed Franklin to call 911. This "prompt summons" of medical help was sufficient to rebut any allegations that Deputy Human was deliberately indifferent towards Fish's medical needs. [2]

### III

Lastly, since Deputy Human did not violate Fish's Fourth or Fourteenth Amendment rights, to the extent plaintiff has renewed her municipal and supervisory liability claims on appeal, we affirm summary judgment for Cumberland County and the Sheriff. A constitutional

---

[2] To the extent Plaintiff takes issue with the handcuffing of Fish, Plaintiff Br. at 4, Deputy Human was not involved in this action; therefore, the statement is wholly irrelevant to her appeal.

violation is prerequisite to recovery on such claims. *France v. Lucas*, 836 F.3d 612, 631 (6th Cir. 2016).

**IV**

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment for defendants.