DISSENT
KAREN NELSON MOORE, Circuit Judge,
dissenting.
Defendanfl-Appellee Justin Schlabach shot dead Timothy Mitchell (“Mitchell”), a man whom Schlabach knew to be unarmed and whom reasonable jurors could perceive not to be dangerous based on the video footage of Mitchell’s death. I believe that clearly established law should have warned Schlabach not to use deadly force when the facts are viewed in the light most favorable to Plaintiff-Appellant Ronald Joseph Mitchell (“Plaintiff’), the personal representative of the estate of Timothy Mitchell. Therefore, I respectfully dissent.
I. STANDARD OF REVIEW
Before explaining my view of the merits, I wish to amplify the legal standard for analyzing video evidence at the summary-judgment stage. I agree with the majority that if one party’s “version of events is so utterly discredited by the record that no reasonable jury could have believed him, ... [courts] should ... view[ ] the facts in the light depicted by the videotape.” Scott v. Harris, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Unfortunately, as this case and Scott itself illustrate, “the light depicted by the videotape” is not always obvious.
In Scott, which incidentally also involved a videotape of a car chase, the Supreme *427 Court held that the videotape at issue discredited the plaintiffs version of events that “there was little, if any, actual threat to pedestrians or other motorists.” Id. at 378, 127 S.Ct. 1769 (quoting Harris v. Coweta Cty., 433 F.3d 807, 815 (11th Cir. 2005)). Despite this holding, a later study of Scott revealed that jurors’ view of the videotape varied depending on their background and beliefs: “African Americans, low-income workers, and residents of the Northeast, for example, tended to form more pro-plaintiff views of the facts than did the Court. So did individuals who characterized themselves as liberals and Democrats.” Dan M. Kahan, David A. Hoffman & Donald Braman, Whose Eyes Are You Going to Believe? Scott v. Harris and the Perils of Cognitive Illiberalism, 122 Harv. L. Rev. 837, 841 (2009). Such disparity should not come as a surprise. “Social psychology teaches us that our perceptions of fact are pervasively shaped by our commitments to shared but contested views of individual virtue and social justice.” Id. at 842. And “although our ability to perceive this type of value-motivated cognition in others is quite acute, our power to perceive it in ourselves tends to be quite poor.” Id. at 842-43.
It is a difficult task to. consider the viewpoints of individuals whose experience one has not lived. But Scott, oddly enough in light of the aforementioned study, demands no less. The Supreme Court instructed us that in order to consider the light depicted by the videotape, we must determine that one party’s “version of events is so utterly discredited by the record that no reasonable jury could have believed him.” Scott, 550 U.S. at 380, 127 S.Ct. 1769. One cannot say that every reasonable jury would be so utterly convinced by a videotape as to disbelieve one party’s version of events without considering how every reasonable juror, based on his or her experience, may view a police officer’s actions as more or less reasonable or a suspect’s actions as more or less threatening. It is therefore with the humble understanding that I, like anyone else, “lack full insight into how the mechanisms of value-motivated- cognition shape [my] and others’ perceptions of particular facts,” Kahan et al., supra, at 898, that I view the videotape and other facts in this case. I conclude that the record does not utterly discredit Plaintiffs version of events.
II. HAS PLAINTIFF SHOWN A CONSTITUTIONAL VIOLATION
“A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.” Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); Dickerson v. McClellan, 101 F.3d 1151, 1163 (6th Cir. 1996) (observing that “persons have a clearly established right not to be shot unless they posed a threat to a pursuing officer or others”). As the majority notes, “we have employed a non-exhaustive list of three factors to evaluate whether an officer’s actions are reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.” Mullins v. Cyranek, 805 F.3d 760, 765 (6th Cir. 2015). I concur that the ten-minute, high-speed car chase that preceded Mitchell’s death was a serious crime. See Jackson v. Wilkins, 517 Fed.Appx. 311, 316 (6th Cir. 2013) (observing that resisting arrest via a high-speed car chase is a “serious crime[ ]”). However, I disagree that the second and third Mullins factors weigh in favor of Schlabach when the facts are viewed in the light most favorable to Plaintiff. Therefore, and under the totality of the circumstances, I believe *428 that Plaintiff -has shown a constitutional violation at this stage of the case.
A. Second Mullins Factor: Whether the Suspect Poses an Immediate Threat to the Safety of the Officers, or Others
I believe that there is a genuine issue of material fact as to whether Mitchell posed an immediate threat to Schlabach or others. Crucially, Schlabach actually knew that Mitchell was unarmed at the time of the shooting. When asked whether he believed that Mitchell had a weapon, Schla-bach responded, “No. I mean I guess I didn’t know, but I don’t—I didn’t see anything,” R. 44-1 (Schlabach Dep. at 68) (Page ID #358); see also id, at 77 (Page ID #360) (Q: “Did you see a weapon?” A: “No.”). To this response, it bears repeating that “[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead.” Garner, 471 U.S. at 11, 105 S.Ct. 1694. If Schlabach, truly knew that Mitchell was unarmed, an inference that a reasonable juror could draw from the above statement, such a juror could conclude that Schlabach unconstitutionally seized Mitchell’s life.
The majority states that “Schlabach only testified that he did not believe that Mitchell was armed, not that he knew that Mitchell was unarmed” and that “Schla-bach could have reasonably believed Mitchell had a handgun, a knife, or some other weapon concealed on his person.” Majority Op. at 422. This is not taking the facts in the light most favorable to Plaintiff. A reasonable juror could conclude, based on Schlabach’s statement, that he knew- Mitchell to be unarmed. And semantics aside, Schlabach did not state that he believed Mitchell to be armed with a handgun, a knife, or some other weapon. To infer such belief would be taking the facts in the light most favorable to Schlabach rather than Plaintiff. It is a remarkable admission for an officer to shoot someone whom he knew to be unarmed. Such an admission seriously undermines the majority’s holding, that Mitchell posed a serious threat to Schlabach.
Beyond Schlabach’s knowledge that Mitchell was unarmed, the facts viewed in the light most favorable to Plaintiff display a general lack' of dangerousness on the part of Timothy Mitchell. First, a reasonable juror watching the dash-cam video could conclude that Mitchell walked toward Schlabach in'a nondangerous manner. We have previously held that when a suspect walks toward an officer with his hands at his side, it is unreasonable for the officer, on this basis alone, to shoot the suspect. See Dickerson, 101 F.3d at 1163; cf. Sample v. Bailey, 409 F.3d 689, 697-98 (6th Cir. 2005) (holding that the officer violated the suspect’s constitutional rights when the officer shot the suspect as the suspect- exited a cabinet toward the officer). Here, the dash-cam depicts Mitchell turning around and walking with his arms by his side toward Schlabach. R. .20-1 (Video at 16:41:19-22) (Page ID #88). Even if Mitchell approached Schlabach with “clenched fists, wide eyes, ... refusing to listen to any of [Schlabach’s] direct commands,” R, 44-1 (Schlabach Dep. at 95) (Page ID #365), characterizations that are not evident from the video, this does not necessarily make Mitchell a dangerous suspect who must be shot down.
Second, viewing the facts in the light most favorable- to Plaintiff, a jury could-conclude that Schlabach and Timothy Mitchell were not close to one another when Mitchell'was shot; they were up to 21 feet apart. R. 44-4 (Croley Dep. at 48) (Page ID #403); see also R. 44-2 (Bruno Dep. at 46-47) (Page ID #384) (concluding “generally” that the closest spent, casing was forty-five feet from Mitchell’s body).
*429 Although the record does not indicate the exact distance between Schlabach and Mitchell when Mitchell was shot, a reasonable juror could conclude that Mitchell was far enough away that he did not pose an immediate threat to Schlabach. This point is perhaps best articulated by W. Ken Katsaris, a law-enforcement officer and instructor with over thirty years of extensive experience, who stated, “I did not see where Mitchell in any way could conceivably be an immediate threat to the safety of the officer or others. Mitchell was obviously not armed, not threatening Schla-bach, and appears to want to avoid the aggressive approach of Schlabach.” R. 44-5 (Katsaris Aff. at 9) (Page ID #424).
On this point, the majority once again draws inferences in favor of Schlabach rather than Plaintiff. Recognizing that “the video does not allow for a precise determination of the distance between Mitchell and Schlabach at the time of the first shot,” the majority nevertheless concludes that “there is no question that Mitchell showed no signs of stopping and that one more step would have placed Mitchell in a position to attack Schlabach with his fists/’ Majority Op. at 423. However, because the video does not reveal the distance between Mitchell and Schlabach, a permissible inference to draw is that the two were. 21 feet apart, R. 44-4 (Croley Dep. at 48) (Page ID #403), rather than ‘‘one more step” away. And whether Mitchell was “charging],” Majority Op. at 422-23, or took an • “aggressive approach,” id., such that he “showed no signs of stopping,” id. at 423, are the sort of descriptive conclusions that we ordinarily leave to a jury. I cannot say- that there is not a single reasonable juror who would characterize Mitchell’s gait as a “walk” rather- than a “charge” or “calm” rather than “aggressive.” Katsaris’s testimony only bolsters my view that' a jury could differ with the majority’s characterizations of Mitchell’s demeanor and gait. See R. 44-5 (Katsaris Aff. at 9) (Page ID #424).
The majority also dubiously observes that Mitchell “might well have attacked Schlabach with his fists, or ,.. might have tried to wrestle for control of Schlabach’s gun so that he could use it against the officer.” Majority Op. at 423. The video does not mandate the majority’s inferences. In fact, Schlabach had a triple-retention holster, which makes it “more difficult for a ... subject to remove [the] weapon ... in a struggle.” R. 44-1 (Schlabach Dep. at 79) (Page ID #361). Most troublingly, it is theoretically possible in every police encounter for an unarmed suspect to wrest control of the officer’s gun or to engage in fisticuffs. To hold that deadly force is warranted because of this ubiquitous possibility undermines the cardinal principle that “[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead.” Garner, 471 U.S. at 11, 105 S.Ct. 1694.
Third, and in addition to weighing the threat that Mitchell posed to Schlabach, reasonable jurors may consider that Schla-bach had less deadly means of subduing Mitchell without using deadly force. See Bell v. Cumberland. Cty., 665 Fed.Appx. 421, 426 (6th Cir. 2016) (considering that the officer “had exhausted all other options,” including using pepper spray and a baton). Schlabach kept a baton in his duty bag, -which was in the front passenger side seat. R. 44-1 (Schlabach Dep. at 76-77) (Page ID #360). However, he did not remove the baton because, as he put it, “what time do I have to reach around and try to find something[?J” Id. at 77 (Page ID #360). Schlabach was also armed with and trained to use pepper spray, which he refused to use because-he believed that, “it would render [him] basically ineffective.” Id. at 24 (Page ID #347); R. 44-5 (Katsar- *430 is Aff. at 10) (Page ID #425). As Katsaris observed,
Officer Schlabach, to compound this, at maximum, physical force encounter, did not carry his baton on his person, preferring to carry it in a bag in his patrol car, and even though Schlabach did have OC Restraint Spray on him, refuses to use it for the fear of being affected by it. This, of course, leaves Schlabach only the lowest level of force, physical control, or the highest level of force, deadly by imposition of his pistol. He chose his pistol, and in my opinion, applying all of the recognized [Michigan Commission on Law Enforcement Standards] training, and training provided for officers similarly situated was objectively unreasonable.
R. 44-5 (Katsaris Aff. at 10) (Page ID #425). Although the availability of less deadly force may be “insufficient” on its own to “render [Schlabach’s] use of deadly force unreasonable under these specific circumstances,” Majority Op. at 423, a reasonable juror could take such availability into consideration in evaluating the reasonableness of Schlabach’s actions. See Bell, 665 Fed.Appx. at 426.
Fourth, the majority observes that this is a unique case because Schlabach was “the lone available officer at the time,” was located “in the middle of an unpopulated national forest after Mitchell charged toward him in direct defiance of orders to drop to the ground,” and did so after an “extended 100-mile-per-hour car chase in the rain.” Majority Op. at 423. However, each of these observations once again does not take the facts in the light most favorable to Plaintiff. There is a genuine dispute as to whether Schlabach was alone or isolated in a material way. Two officers arrived on scene within two minutes of Schlabach parking his car, R. 20-1 (Video at 16:41:06-43:04) (Page ID #88), and several additional officers arrived in the twenty minutes thereafter, id. at 16:41:06-17:01:00 (Page ID #88). Two passersby came into view within five minutes of Schlabach parking his car. Id. at 16:41:06-43:34, 45:22 (Page ID #88). In addition, Schlabach acknowledged that he “was aware that somebody was coming” as backup. R. 44-1 (Schlabach Dep. at 61) (Page ID #356). And although deadly force may be used to stop a car chase in which the suspect “pose[s] an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase,” Scott, 550 U.S. at 384, 127 S.Ct. 1769, the car chase here had ended when Schlabach shot Mitchell. See R. 20-1 (Video at 16:41:22) (Page ID #88).
Finally, even if reasonable jurors could conclude that the first shot was warranted, the second shot raises its own set of issues regarding reasonableness. When plaintiffs allege excessive force with respect to multiple shots, “the appropriate method of analysis is to ‘carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.’” Dickerson, 101 F.3d at 1161 (quoting Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994)). “When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.” Id. at 1162 n.9, quoted in Mullins, 805 F.3d at 768. The video depicts Mitchell slowing down and hunching over immediately after Schlabach fired his first shot. R. 20-1 (Video at 16:41:24) (Page ID #88). In addition, the postmortem examination report indicates that “[d]eath occurred almost immediately from rapid exsanguination resulting from right atrial laceration caused by gunshot wound #A” and that “[o]nly minimal traumatic injuries were observed from the motor vehicle crash and gunshot wound #B.” R. 20-5 (Postmortem Examination *431 Report at 1) (Page ID #132). A reasonable juror could conclude that Mitchell posed no serious threat to anyone after the first shot, which may have killed him “immediately,” id., and which at a minimum visibly slowed him down, see R. 20-1 (Video at 16:41:24) (Page ID #88). See Margeson v. White Cty., 579 Fed.Appx. 466, 472 (6th Cir. 2014) (“[A] jury could certainly conclude that shooting at a man 43 times, including at least 12 shots after he had fallen to the ground, amounts to an unreasonable and excessive use of force, under the circumstances described here.”).
Altogether, there exist numerous genuine issues of material fact as to “whether the [Mitchell] pose[d] an immediate threat to the safety of the officers or others.” See Mullins, 805 F.3d at 765. Therefore, I believe that the second Mullins factor weighs in favor of Plaintiff.
B. Third Mullins Factor: Whether the Suspect Is Actively Resisting Arrest or Attempting to Evade Arrest by Flight
I also believe that the third Mullins factor—whether Mitchell actively resisted arrest or attempted to evade arrest by flight—weighs in favor of Mitchell when the facts are viewed in his favor. As a preliminary matter, the question of evasion is easily answered when viewed in the light most favorable to Plaintiff: although Timothy Mitchell was evading Schlabach during the car chase, as Schlabach states in his brief, “Mitchell was not shot in the back as he evaded arrest by running away from Officer Schlabach.” Appellee’s Br. at 31.
Thus, the only question is whether Mitchell was “actively resisting arrest” when he was shot. See Mullins, 805 F.3d at 765. The facts east in the light most favorable to Plaintiff show that he was not. As referenced above, Timothy Mitchell was walking toward Schlabach when he was shot. After watching the dash-cam video, reasonable jurors could conclude that Mitchell was not walking “aggressively” with “[c]lenched fists” and “wide eyes,” R. 44-1 (Schlabach Dep. at 95) (Page ID #365), but rather that he was walking calmly toward Schlabach. See Brown v. Weber, 555 Fed.Appx. 550, 553 (6th Cir. 2014) (holding that there was not “incontrovertible evidence that” the suspect actively resisted arrest because “the surveillance video [was] ambiguous as to whether [he] took a ‘fighting stance’” when confronting the officer). In addition, reasonable jurors could reject Schlabach’s contention that Mitchell “told me I was gonna have to fucking shoot him,” R. 44-1 (Schlabach Dep. at 91) (Page ID #364), because Mitchell is not alive to contradict this self-serving account of Schlabach. See Jefferson v. Lewis, 594 F.3d 454, 462 (6th Cir. 2010) (declining to credit “what may be a self-serving account by the police officer” (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994))). Mitchell’s actions, stripped as they must be of inferences that favor Schlabach, leave us with a situation that is a far cry from cases in which the suspect actively resisted the officer. See, e.g., Bell, 665 Fed.Appx. at 426 (holding that there was active resistance because the suspect “pinned [the officer] to the ground, was delivering continuous blows to his head and ribs, and was about to strike him with a cast iron skillet, which would have inflicted serious—if not deadly— harm”); Davenport v. Causey, 521 F.3d 544, 551-53 (6th Cir. 2008) (holding that there was active resistance because the suspect delivered “closed-fisted blows” to the officer’s head); Untalan v. City of Lorain, 430 F.3d 312, 313, 317 (6th Cir. 2005) (holding that there was active resistance because the suspect stabbed an officer with a knife). Therefore, I believe that the third Mullins factor favors Mitchell at this stage of the case.
*432 * * *
In consideration of these factors altogether, the totality of the circumstances weighs against summary adjudication. Although the first Mullins factor favors Schlabach, the second and third factors favor Mitchell. Particularly in a case such-as this, where there are numerous statements and pieces of video footage that cast doubt on whether the suspect posed an immediate threat to the officer or others, summary judgment should not dispose of the case. See Sigley v. City of Parma Heights, 437 F.3d 527, 534-36 (6th Cir. 2006) (holding that summary judgment was inappropriate where there were genuine issues of material fact as to the secorid factor). Therefore, I believe that Plaintiff has put forth sufficient evidence that, when viewed in the light most favorable to him, demonstrate a violation of Timothy Mitchell’s constitutional rights.
III. WAS THE OFFICER’S ACTION CONTRARY TO CLEARLY ESTABLISHED LAW?
I also believe that the case law available at the time of the shooting “gave [Schla-bach] fair warning that [his] conduct violated the Constitution” because of the violation’s obviousness when viewed in the light most favorable to Ronald Mitchell. See Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct 2508, 153 L.Ed.2d 666 (2002). I fully recognize that “‘clearly established law* should not be defined ‘at a high level of generality.’” White v. Pauly, 580 U.S. ——, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). However, and keeping in mind the central inquiry of whether “existing precedent ,.. -placed the statutory or constitutional question beyond debate,” id. at 551 (quoting Mullenix v. Luna, 577 U.S. —, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015)); there are nevertheless some “obvious” cases in which general “standards can ‘clearly establish’ the answer, even without a body of relevant case law.” Sample, 409 F.3d at 699 (quoting Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 696, 160 L.Ed.2d 583 (2004)).
This is one such obvious case. “We have held that it has been clearly established'in this circuit for the last [thirty] years that a criminal suspect ‘ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or to others during flight,’” Sample, 409 F.3d at 699 (quoting Robinson v. Bibb, 840 F.2d 349, 351 (6th Cir. 1988)), Specifically, “an officer may not use deadly force to seize a suspect walking towards the police in an enclosed unfamiliar area at night with his hands at his side.” Id. (citing Dickerson, 101 F.3d at 1163). Nor may “an officer use deadly force to effectuate an arrest of an intoxicated suspect at night in an unfamiliar place without a reasonable belief that the suspect posed a significant danger to the officer or others.” Id. (citing Sova v. City of Mt. Pleasant, 142 F.3d 898, 903 (6th Cir. 1998)), It is of no moment that Schlabach was in an unfamiliar place, see Sova, 142 F.3d at 903, or that Mitchell was walking towards him, see Dickerson, 101 F.3d at 1163. Rather, when cast in the light most favorable to Plaintiff, the facts of that fateful afternoon should have made it obvious- to any reasonable officer that Timothy Mitchell, whom Schlabach believed to be unarmed and who was not otherwise dangerous, did not deserve to be met with deadly force,
I do not believe that qualified immunity shields Schlabach from liability under § 1983. Therefore,- I would reverse the district court’s judgment and remand the case for. further proceedings.