RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RONALD JOSEPH MITCHELL, as Personal Representative of the Estate of Timothy Joseph Mitchell, deceased,

*Plaintiff-Appellant,*

*v.*

JUSTIN SCHLABACH, Officer,

*Defendant-Appellee.*

No. 16-1522

Appeal from the United States District Court for
the Western District of Michigan at Marquette.
No. 2:15-cv-00016—Timothy P. Greeley, Magistrate Judge.

Decided and Filed: July 19, 2017

Before: MERRITT, MOORE, and STRANCH, Circuit Judges

_____

## COUNSEL

**ON BRIEF:** Sima G. Patel, FIEGER, FIEGER, KENNEY, & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Susan Healy Zitterman, Susan D. MacGregor, KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK, Detroit, Michigan, for Appellee.

MERRITT, J., delivered the opinion of the court in which STRANCH, J., joined. MOORE, J. (pp. 14–23), delivered a separate dissenting opinion.

---

**OPINION**

---

MERRITT, Circuit Judge.    Defendant-Appellee Justin Schlabach, an officer of the Munising Police Department, shot and killed Timothy Mitchell ("Mitchell") following a lengthy and dangerous car chase.  The crucial facts at the scene of the shooting were recorded on the officer's dashboard camera, and our decision in this case turns in large measure on this evidence. Plaintiff-Appellant Ronald Mitchell filed this § 1983 suit against Schlabach on behalf of Mitchell's estate seeking damages for Schlabach's alleged violation of Mitchell's right to be free from excessive force under the Fourth Amendment.  Schlabach moved for summary judgment on the basis of qualified immunity, and the district court granted his motion.  For the reasons articulated below, we **AFFIRM** the judgment of the district court.

## I.  Background

Since this is an appeal from an award of summary judgment, we view the facts in the light most favorable to the non-moving party—here, Mitchell's personal representative. *Coble v. City of White House*, 634 F.3d 865, 868 (6th Cir. 2011).  We also draw all reasonable inferences in his favor. *Id.*  However, we do not accept Plaintiff's facts to the extent that they are "blatantly contradicted by the record." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (internal quotation marks omitted).  There is no serious dispute about the facts of this case because a camera on the officer's dashboard captured most of the relevant event. What follows is an account of the facts in the light most favorable to the Plaintiff.

### A.  Factual Background

On July 14, 2014, the 911 dispatch center in Alger County, Michigan received a report that "Tim Mitchell" had assaulted another individual named Kevin and that he was "headed towards Christmas," Michigan.  The caller stated that Mitchell had been drinking and was "swerving all over the road."  The dispatcher then contacted Schlabach—the only officer on duty at the time—and notified him that Mitchell was "pretty intoxicated" and had been "involved in a verbal altercation."

Schlabach identified Mitchell's car on a highway and followed it into a parking lot. Mitchell brought his vehicle to a stop in the parking lot, and Schlabach made a show of authority by pulling his police cruiser up to the driver's side of Mitchell's car. As soon as Schlabach came to a stop, Mitchell sped back onto the highway in an effort to evade arrest. Schlabach pursued Mitchell as he careened through residential neighborhoods, around cars, and through stop signs. Large portions of the chase involved Mitchell traveling at speeds in excess of 100 miles per hour. Inclement weather made the chase even more treacherous as it was pouring rain throughout the entirety of the pursuit. At one point, Mitchell "slammed on the brakes," which Schlabach interpreted as an attempt to either "ram [him], or get [him] to break off th[e] pursuit." Schlabach requested backup at several points, and the dispatcher confirmed that at least two officers were en route to provide assistance.

Ten minutes into the car chase, Mitchell ran his car into a roadside ditch in the middle of a national forest. Schlabach parked his car 63.6 feet from Mitchell's car, where he assessed the situation "to see what's [Mitchell] doing next, where's he gonna go, does he have a weapon, what's going on, is the vehicle in [sic] fire." Mitchell exited the car, looked toward Schlabach's vehicle, and then turned away while he pulled up his pants and crouched toward the ground. Mitchell appeared to be unarmed when he left his vehicle, and Schlabach did not observe anything indicating that Mitchell had a weapon.

Schlabach exited his vehicle into the pouring rain, drew his handgun, and began slowly approaching Mitchell. Schlabach claims that he gave loud, verbal commands as he approached Mitchell: "Stop, get down, get down on the ground, get down on the f-ing ground." In response, Mitchell turned around and began walking toward Schlabach. Schlabach described Mitchell as walking "aggressively"—that is, with "[c]lenched fists, wide eyes, coming directly in my—towards me, . . . refusing to listen to any of my direct commands." And while the dash-cam video does not clearly show Mitchell's facial expressions or whether his fists were clenched, it leaves little room to doubt the hostility of Mitchell's approach. Indeed, Mitchell headed straight toward Schlabach with long, purposeful steps despite the fact that Schlabach was pointing a gun directly at him. Mitchell continued toward Schlabach even after Schlabach began backing away in fear. Schlabach stated in a deposition that while Mitchell was approaching him, "He told me I

was gonna have to f---ing shoot him," which Schlabach took to mean, "if I didn't shoot him, he was gonna kill me . . . [w]ith his fists, with his feet, with my gun, with anything he possibly could've gotten at the time."

Schlabach took five hurried steps backward in an attempt to keep distance between himself and Mitchell. After Mitchell had pressed Schlabach all the way across the road and the gap between the two had narrowed to "somewhere between 10 and 21 feet," Schlabach fired a shot at Mitchell. Mitchell hunched over slightly, but continued moving purposefully toward Schlabach. Less than one second after firing the first shot and after taking two more steps back, Schlabach fired again. After the second shot, Mitchell hunched over further and turned around. He staggered for several steps back toward his vehicle before collapsing to the ground. Schlabach then holstered his weapon and handcuffed Mitchell. After running to turn off his siren, Schlabach returned to see if Mitchell still had a pulse. An autopsy later confirmed that Mitchell died from the two gunshot wounds inflicted by Schlabach.

Before proceeding with our analysis, we note that the situation escalated rapidly from the time Schlabach exited his car to the time he shot Mitchell. While we needed two paragraphs to describe what happened during the intervening time, it all unfolded in less than twenty seconds. In such situations, we are admonished to make an "allowance for the fact that police officers are often forced to make split-second judgments" when we review their actions for purposes of qualified immunity. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

### B. *Procedural Background*

Ronald Mitchell, the personal representative of the decedent Mitchell's estate, filed a complaint under 28 U.S.C. § 1983, alleging that Schlabach violated Mitchell's Fourth Amendment rights when he "unlawfully seized and used unnecessary, unreasonable, excessive, and deadly force against" Mitchell. Schlabach then filed a motion for summary judgment, arguing that he was entitled to qualified immunity and that he did not violate Mitchell's civil rights. The lower court granted Schlabach's motion, finding that Schlabach was entitled to qualified immunity both because the facts did not amount to a constitutional violation and

because any right that Schlabach might have violated was not "clearly established" at the time of the shooting.

This appeal followed.

## II. Discussion

Plaintiff argues on appeal that the district court committed two reversible errors when it granted Schlabach's motion for summary judgment:  First, Plaintiff contends that the lower court wrongly held that the allegations in his complaint did not rise to the level of a constitutional violation.  Second, Plaintiff argues that the lower court erred in holding that the constitutional right in question was not "clearly established" at the time of the shooting.  Because we agree with the district court's conclusions on both issues, we affirm the judgment of the district court.

We review an award of summary judgment on the basis of qualified immunity *de novo*. *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015).  As discussed above, we view the facts in the light most favorable to the plaintiff and draw all reasonable inferences in his favor.  *Coble*, 634 F.3d at 868.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Miller v. Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine if a defendant is entitled to qualified immunity, we ask two questions:  "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?" *Id.*  Government officials are protected by the doctrine of qualified immunity unless the answer to both questions is yes. *See id.*

### A.  Has Plaintiff Shown a Constitutional Violation?

We first ask whether, viewing the facts in the light most favorable to the Plaintiff, Schlabach's use of deadly force violated the Fourth Amendment's requirement of

reasonableness. *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014)).  We hold that it did not.

While the ultimate determination of reasonableness must be based on the totality of the circumstances, this court has repeatedly found three factors to be helpful in excessive force cases:  "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006)) (internal quotation marks omitted).  We are admonished not to assess those factors from a distance, but rather to consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 765–66 (quoting *Graham*, 490 U.S. at 396–97).

Mitchell's crimes were severe.  He was first reported to the police for driving drunk after provoking an altercation with another individual.  The severity of his crimes increased once Schlabach arrived on the scene.  Mitchell immediately—and presumably still under the influence—began to flee from Schlabach.  During the course of the ten-minute-long chase, Mitchell traveled through residential neighborhoods at dangerous speeds far exceeding posted limits and passed several vehicles on the highway at speeds in excess of 100 miles per hour.  In doing so, Mitchell knowingly placed himself, Schlabach, and the public at risk of severe injury or death.  Had Mitchell survived, he likely would have been charged with several serious crimes under Michigan law.  *See* Mich. Comp. Laws Ann. § 257.626 (reckless driving); *id.* § 257.625 (driving while intoxicated); *id.* § 750.479a (fleeing and eluding arrest).  The seriousness of these offenses is underscored by the fact that the latter two are felonies under the Michigan Penal Code.  *See Mullins*, 805 F.3d at 766 (implying that a crime's status as a felony is an indication of its seriousness).  Thus, we find that the severity factor weighs in favor of a finding of reasonableness.[1]

---

[1]This factor, standing alone, would not have justified the use of deadly force here.  *See Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007).

Mitchell also posed a serious threat to Schlabach's safety. Mitchell's personal representative alleges that Mitchell was simply "walking" toward Schlabach "with his hands at his sides" and "no weapon in [his] hands" when Schlabach shot him. Mitchell's representative further denies that Mitchell was "rushing, running, or charging" toward Schlabach when he was shot. We disregard those allegations, however, because they are "blatantly contradicted by the record." *Coble*, 634 F.3d at 868 (quoting *Scott*, 550 U.S. at 380) (internal quotation marks omitted). The available video footage clearly shows that Mitchell approached Schlabach at more than a walking pace. Indeed, he moved toward Schlabach with speed, purpose, and confidence despite the fact that Schlabach had a gun trained on him. Mitchell continued charging toward Schlabach even as Schlabach changed trajectories and began backing away from him. We note that Mitchell's verbal threats were unrecorded but that Schlabach testified that Mitchell said that Schlabach would "have to 'f---ing shoot [him].'" The video evidence corroborates that testimony because it makes clear that Mitchell intended a confrontation with Schlabach. By the time Schlabach discharged his weapon, Mitchell had already pressed him back across the road and had narrowed the gap between them considerably. If Mitchell had continued any further, Schlabach may not have had enough time to react without a violent confrontation. The same analysis applies to Schlabach's second shot since Mitchell continued charging toward Schlabach even after the first shot; it was only after Schlabach fired the second shot that Mitchell recoiled and began to retreat. Taken together, these facts all indicate that Schlabach had "probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury" when he fired both shots. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

While it is beyond question that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," it is also clear that Mitchell was something more than a "nondangerous suspect." *Id.* at 11. As discussed above, the available evidence readily establishes that Schlabach reasonably believed that he was in danger of serious physical harm when he shot Mitchell. We therefore will not "second-guess[] [Schlabach's] assessment, made on the scene, of the danger presented by" Mitchell's approach. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam). Accordingly, we find that the seriousness-of-the-threat factor also weighs in favor of a finding of reasonableness here.

Finally, Mitchell was resisting arrest when he was shot. After crashing his car at the conclusion of a high-speed car chase, Mitchell began to charge an officer who was pointing a firearm at him. These circumstances alone support the conclusion that Mitchell was resisting arrest. And while it is true that we cannot see Mitchell's facial expression as he approached or whether his fists were clenched, the only reasonable inference from the available evidence is that Mitchell did not intend to submit to arrest peacefully. Even drawing all available inferences in favor of the plaintiff, we conclude that Mitchell was actively resisting arrest at the time he was shot. Accordingly, the third factor also supports a finding of reasonableness here.

And while each of the factors above supports a finding of reasonableness, the ultimate question under the first prong of the qualified immunity analysis in this case is whether Schlabach's decision to use deadly force against Mitchell was reasonable under the totality of the circumstances. *Mullins*, 805 F.3d at 765 (citing *Plumhoff*, 134 S. Ct. at 2020). On appeal, Plaintiff points to several circumstances that he claims weigh against a finding of reasonableness.

First, Plaintiff points to Schlabach's deposition testimony that he did not believe that Mitchell was armed. Plaintiff argues that this concession means that Schlabach could not have reasonably believed that Mitchell posed an imminent threat to his safety. Common sense suggests otherwise. As an initial matter, we note that Schlabach only testified that he did not *believe* that Mitchell was armed, not that he *knew* that Mitchell was unarmed. Indeed, Schlabach could have reasonably believed Mitchell had a handgun, a knife, or some other weapon concealed on his person. Even if such a belief was unreasonable, a suspect need not be armed to pose an imminent threat to an officer's safety. Here, Schlabach reasonably feared for his safety despite the fact that Mitchell may have been unarmed—Mitchell's aggressive approach suggested that he might well have attacked Schlabach with his fists, or that he might have tried to wrestle for control of Schlabach's gun so that he could use it against the officer. Thus, we find that Schlabach's testimony is not dispositive on the issue of reasonableness

Second, Plaintiff argues that Schlabach's decision to shoot was unreasonable in light of expert testimony suggesting that Mitchell might have been as far as twenty-one feet away from

Schlabach when he was shot.[2] That evidence, however, is contradicted by the video footage in this case. While the video does not allow for a precise determination of the distance between Mitchell and Schlabach at the time of the first shot, there is no question that Mitchell showed no signs of stopping and that one more step would have placed Mitchell in a position to attack Schlabach with his fists. Based on the record evidence that is not contradicted by the video footage, we hold that the distance between Schlabach and Mitchell at the time of the shooting did not render Schlabach's decision to shoot unreasonable.

Finally, Plaintiff argues that Schlabach's application of deadly force was unreasonable because he did not first attempt to use pepper spray or his nightstick to subdue Mitchell. However, this argument ignores the fact that Schlabach faced a rapidly evolving situation when he stopped his car after Mitchell crashed his vehicle. The fact that a situation "unfolds quickly" is not alone sufficient to justify the application of deadly force, but it is a factor that weighs in favor of a finding of reasonableness when it accompanies a credible threat to the safety of an officer or the public. *See Mullins*, 805 F.3d at 766–67. After being led on a dangerous car chase for more than ten minutes, Schlabach reasonably assumed that Mitchell would do whatever it took to avoid apprehension. As such, Schlabach acted reasonably when he drew his gun upon exiting his vehicle. With his gun already drawn and Mitchell rapidly approaching him, it would have been both impractical and unwise for Schlabach to have holstered his weapon so that he could attempt to use pepper spray or his nightstick against Mitchell. Accordingly, we hold that the fact that Schlabach did not attempt to use less deadly force to subdue Mitchell is insufficient to render his use of deadly force unreasonable under these specific circumstances.

The confrontation in this case was not a typical encounter between a police officer and a defiant suspect. Schlabach, the lone available officer at the time, shot Mitchell during a confrontation in the middle of an unpopulated national forest after Mitchell charged toward him in direct defiance of orders to drop to the ground. The extended, 100-mile-per-hour car chase in the rain that preceded the shooting would have heightened the heart rate, anxiety, and fear of any normal person, police officer or not. The available video evidence makes clear that Mitchell was

---

[2]Contrary to the Plaintiff's assertions that Mitchell might have been as far as 30 feet away from Schlabach at the time of the shooting, the expert testimony actually indicated that the distance between the two was, at most, 21 feet.

close enough to pose a substantial threat to Schlabach's safety at the time he was shot.  Even viewing the facts and video in the light most favorable to Plaintiff, we hold that Schlabach did not violate Mitchell's right to be free from excessive force because his decision to shoot was reasonable under the totality of the circumstances.

To be clear, our decision in this case is largely driven by the available video evidence, which documents most of the relevant events from a helpful angle.  If this case turned on Schlabach's after-the-fact testimony, summary judgment would likely have been inappropriate.  Our holding today is based upon the factual context of a car chase involving a single officer, isolated from backup, who was charged by a suspect who had demonstrated a willingness to put lives at risk in order to evade arrest.  This decision does not stand for the proposition that deadly force is reasonable or proper whenever a suspect charges an officer or defies an order.

### B. Was the Officer's Action Contrary to Clearly Established Law?

While the previous discussion would be sufficient to justify our decision today, we also consider the second prong of the qualified immunity analysis:  whether Schlabach's actions were contrary to "clearly established" law at the time he acted.[3]  We hold that they were not.

The Supreme Court very recently reminded the lower courts that an officer's actions are against "clearly established" law for purposes of qualified immunity only when "'existing precedent . . . place[s] the statutory or constitutional question beyond debate.'"  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  The Court went on to emphasize that courts should not define "clearly established" law "'at a high level of generality.'"  *Id.* at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Instead, they should look only to precedents "particularized to the facts of the case"—although, the standard does not require "a case directly on point."  *Id.* at 551–52 (quoting *Mullenix*, 136 S. Ct. at 308; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted)).  The Supreme Court tells us that this narrow definition of "clearly established"

---

[3]Having already held that Schlabach did not violate Mitchell's rights under the Fourth Amendment, it would be anomalous for us to conclude that Schlabach's actions amounted to a violation of Mitchell's clearly established rights.  Accordingly, the reasoning of this section assumes for the purposes of argument that Schlabach's actions were unconstitutional.  For the reasons set forth below, we hold that even if Schlabach violated Mitchell's rights, those rights were not "clearly established" at the time of the shooting.

functions to protect "all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, Plaintiff relies principally upon the Supreme Court's decision in *Tennessee v. Garner* and this court's decisions in *Sample v. Bailey* and *Dickerson v. McClellan* as support for his assertion that Schlabach violated Mitchell's clearly established constitutional rights. However, none of those cases is sufficiently "particularized" to the facts of this case to place the supposed unconstitutionality of Schlabach's action "beyond debate" because they all involved situations in which the victim did not pose a threat to the shooting officer's safety.

The decision in *Tennessee v. Garner* indisputably enshrines the rule that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. However, that case involved facts much different than the facts of this case. *Garner* centered upon a police officer's decision to shoot an unarmed criminal suspect as he was attempting to flee from the scene of a robbery on foot. *Id.* at 3–4. The police officer testified that he shot the suspect because he was convinced that the suspect would have eluded capture otherwise. *Id.* at 4 n.3. Based on those facts, the Supreme Court determined that the police officer had violated the suspect's clearly established constitutional right to be free from excessive force because the suspect was unarmed and did not pose a danger to the officer or the public. *Id.* at 11. If Mitchell had fled into the forest, *Garner* would be on point. However, Mitchell was not attempting to flee from Schlabach when he was shot; he was doing exactly the opposite—charging toward the officer. To hold that a case instructing officers on the unconstitutionality of shooting a fleeing suspect is instructive in a situation in which the officer is being charged by an unarmed suspect strains reason. To that end, any reliance on *Garner* as support for the claim that Schlabach violated Mitchell's clearly established rights is misplaced because it would require us to define the rights at issue at too high a level of generality. *See al-Kidd*, 563 U.S. at 742.

Plaintiff's reliance upon this court's decision in *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005), is similarly misplaced. The case in *Sample* arose from a police officer's decision to shoot an unarmed suspect who was discovered hiding inside a cabinet in a building that he had attempted to burglarize. *Id.* at 691–92. The officers ordered the suspect to come out of the cabinet with his hands visible. *Id.* at 693–94. As the suspect attempted to use one of his hands

to pull himself out of the cabinet, one of the officers shot him. *Id.* at 692–95. This court first held that the officer's conduct violated the suspect's rights since the shooting officer lacked probable cause to believe that the suspect's movement posed a threat to his safety or the safety of his colleagues. *Id.* at 697–98. The panel went on to hold that the rights violated were "clearly established," reasoning that our previous precedents provided the officer with adequate notice that shooting a criminal suspect is unreasonable "unless the suspect poses a perceived threat of serious physical harm to the officer." *Id.* at 699. The facts here are distinguishable. Unlike the suspect in *Sample*, Mitchell actively ignored Schlabach's commands to "get on the ground" as he continued charging toward Schlabach. An officer in Schlabach's shoes could reasonably have perceived Mitchell as a threat to his safety. Accordingly, *Sample*'s rule against the application of force when a suspect *does not* pose a threat to an officer's safety was insufficient to put Schlabach on notice of the constitutionality of his actions when the suspect *did* pose such a threat.

Finally, the Plaintiff relies on this court's decision in *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), as authority for the idea that Mitchell did not pose a threat to Schlabach's safety because he was walking with his hands by his sides when he was shot. In *Dickerson*, we considered an officer's appeal from the lower court's denial of summary judgment on the basis of qualified immunity in a case involving a police shooting. *Id.* at 1154. The evidence in that case suggested that two police officers had been dispatched after neighbors reported that Dickerson was drunk and had fired nine shots inside his home. *Id.* at 1154. After the officers entered the home, Dickerson closed the cylinder on a revolver, screamed, and ran toward the front door. *Id.* One of the officers took cover inside the home while the other retreated outside. *Id.* Both officers then shot the suspect. *Id.* at 1155. Unlike the case at bar, there was no video evidence of the altercation at issue in *Dickerson* to establish what actually occurred. A witness across the street testified that she saw the suspect walk slowly toward the front door with his hands by his sides and that she then heard a gunshot. *Id.* at 1154–55. She was unable to remember anything beyond that point because she was hit by a stray bullet. *Id.* at 1155. The police provided conflicting testimony, stating that Dickerson exited the home with his handgun pointed at the officer who fled the home and that the officer fired in order to neutralize the threat to his safety. *Id.* This court ultimately held that it lacked jurisdiction over the appeal due to the

conflicting testimony about the facts of the shooting, but we also suggested in dicta that the shooting would have violated Dickerson's clearly established rights if it was true that he walked slowly toward the door with his hands at his sides when he was shot. *Id.* at 1164–65. That dicta does not support the Plaintiff's claim because it assumed a set of facts in which the victim could not have been reasonably perceived as an immediate threat to the officers' safety. Here, the video evidence provides clear proof that Schlabach reasonably feared for his safety when he fired both shots. Accordingly, *Dickerson*'s discussion of a situation in which the suspect does not pose a threat to the shooting officer's safety is not relevant to our analysis in this case.

As the dissent correctly notes, it is settled law that an unarmed defendant has a right not to be shot dead when he does not pose a risk of danger to police or the public. However, even viewing the facts in the light most favorable to the Plaintiff, we hold that the record evidence, including the video, show that Schlabach had probable cause to believe that Mitchell posed an immediate threat to his safety. The Plaintiff is unable to point to a case holding that it is unconstitutional for an officer to shoot a criminal suspect under similar circumstances. Since Schlabach did not violate any of Mitchell's "clearly established" rights, the second prong of the qualified immunity analysis also supports our decision to affirm the district court's award of summary judgment.

\* \* \*

Accordingly, we **AFFIRM** the judgment of the district court.

_____

**DISSENT**

_____

KAREN NELSON MOORE, Circuit Judge, dissenting.   Defendant-Appellee Justin Schlabach shot dead Timothy Mitchell ("Mitchell"), a man whom Schlabach knew to be unarmed and whom reasonable jurors could perceive not to be dangerous based on the video footage of Mitchell's death.  I believe that clearly established law should have warned Schlabach not to use deadly force when the facts are viewed in the light most favorable to Plaintiff-Appellant Ronald Joseph Mitchell ("Plaintiff"), the personal representative of the estate of Timothy Mitchell.  Therefore, I respectfully dissent.

## I.  STANDARD OF REVIEW

Before explaining my view of the merits, I wish to amplify the legal standard for analyzing video evidence at the summary-judgment stage.  I agree with the majority that if one party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him, . . . [courts] should . . . view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).  Unfortunately, as this case and *Scott* itself illustrate, "the light depicted by the videotape" is not always obvious.

In *Scott*, which incidentally also involved a videotape of a car chase, the Supreme Court held that the videotape at issue discredited the plaintiff's version of events that "there was little, if any, actual threat to pedestrians or other motorists." *Id.* at 378 (quoting *Harris v. Coweta Cty.*, 433 F.3d 807, 815 (11th Cir. 2005)).  Despite this holding, a later study of *Scott* revealed that jurors' view of the videotape varied depending on their background and beliefs:  "African Americans, low-income workers, and residents of the Northeast, for example, tended to form more pro-plaintiff views of the facts than did the Court.  So did individuals who characterized themselves as liberals and Democrats."  Dan M. Kahan, David A. Hoffman & Donald Braman, *Whose Eyes Are You Going to Believe?* Scott v. Harris *and the Perils of Cognitive Illiberalism*, 122 Harv. L. Rev. 837, 841 (2009).  Such disparity should not come as a surprise.  "Social psychology teaches us that our perceptions of fact are pervasively shaped by our commitments to

shared but contested views of individual virtue and social justice." *Id.* at 842. And "although our ability to perceive this type of value-motivated cognition in others is quite acute, our power to perceive it in ourselves tends to be quite poor." *Id.* at 842–43.

It is a difficult task to consider the viewpoints of individuals whose experience one has not lived. But *Scott*, oddly enough in light of the aforementioned study, demands no less. The Supreme Court instructed us that in order to consider the light depicted by the videotape, we must determine that one party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott*, 550 U.S. at 380. One cannot say that *every* reasonable jury would be so utterly convinced by a videotape as to disbelieve one party's version of events without considering how every reasonable juror, based on his or her experience, may view a police officer's actions as more or less reasonable or a suspect's actions as more or less threatening. It is therefore with the humble understanding that I, like anyone else, "lack full insight into how the mechanisms of value-motivated cognition shape [my] and others' perceptions of particular facts," Kahan et al., *supra*, at 898, that I view the videotape and other facts in this case. I conclude that the record does not utterly discredit Plaintiff's version of events.

## II. HAS PLAINTIFF SHOWN A CONSTITUTIONAL VIOLATION

"A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) (observing that "persons have a clearly established right not to be shot unless they posed a threat to a pursuing officer or others"). As the majority notes, "we have employed a non-exhaustive list of three factors to evaluate whether an officer's actions are reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). I concur that the ten-minute, high-speed car chase that preceded Mitchell's death was a serious crime. *See Jackson v. Wilkins*, 517 F. App'x 311, 316 (6th Cir. 2013) (observing that resisting arrest via a high-speed car chase is a "serious crime[]"). However, I disagree that the second and third *Mullins* factors weigh in favor of Schlabach when the facts are viewed in the

light most favorable to Plaintiff. Therefore, and under the totality of the circumstances, I believe that Plaintiff has shown a constitutional violation at this stage of the case.

**A.      Second *Mullins* Factor:   Whether the Suspect Poses an Immediate Threat to the Safety of the Officers or Others**

I believe that there is a genuine issue of material fact as to whether Mitchell posed an immediate threat to Schlabach or others. Crucially, Schlabach actually knew that Mitchell was unarmed at the time of the shooting. When asked whether he believed that Mitchell had a weapon, Schlabach responded, "No. I mean I guess I didn't know, but I don't—I didn't see anything." R. 44-1 (Schlabach Dep. at 68) (Page ID #358); *see also id.* at 77 (Page ID #360) (Q: "Did you see a weapon?" A: "No."). To this response, it bears repeating that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. If Schlabach truly knew that Mitchell was unarmed, an inference that a reasonable juror could draw from the above statement, such a juror could conclude that Schlabach unconstitutionally seized Mitchell's life.

The majority states that "Schlabach only testified that he did not *believe* that Mitchell was armed, not that he *knew* that Mitchell was unarmed" and that "Schlabach could have reasonably believed Mitchell had a handgun, a knife, or some other weapon concealed on his person." Majority Op. at 9. This is not taking the facts in the light most favorable to Plaintiff. A reasonable juror could conclude, based on Schlabach's statement, that he knew Mitchell to be unarmed. And semantics aside, Schlabach did not state that he believed Mitchell to be armed with a handgun, a knife, or some other weapon. To infer such belief would be taking the facts in the light most favorable to Schlabach rather than Plaintiff. It is a remarkable admission for an officer to shoot someone whom he knew to be unarmed. Such an admission seriously undermines the majority's holding that Mitchell posed a serious threat to Schlabach.

Beyond Schlabach's knowledge that Mitchell was unarmed, the facts viewed in the light most favorable to Plaintiff display a general lack of dangerousness on the part of Timothy Mitchell. First, a reasonable juror watching the dash-cam video could conclude that Mitchell walked toward Schlabach in a nondangerous manner. We have previously held that when a suspect walks toward an officer with his hands at his side, it is unreasonable for the officer, on

this basis alone, to shoot the suspect. *See Dickerson*, 101 F.3d at 1163; *cf. Sample v. Bailey*, 409 F.3d 689, 697–98 (6th Cir. 2005) (holding that the officer violated the suspect's constitutional rights when the officer shot the suspect as the suspect exited a cabinet toward the officer). Here, the dash-cam depicts Mitchell turning around and walking with his arms by his side toward Schlabach. R. 20-1 (Video at 16:41:19–22) (Page ID #88). Even if Mitchell approached Schlabach with "clenched fists, wide eyes, . . . refusing to listen to any of [Schlabach's] direct commands," R. 44-1 (Schlabach Dep. at 95) (Page ID #365), characterizations that are not evident from the video, this does not necessarily make Mitchell a dangerous suspect who must be shot down.

Second, viewing the facts in the light most favorable to Plaintiff, a jury could conclude that Schlabach and Timothy Mitchell were not close to one another when Mitchell was shot; they were up to 21 feet apart. R. 44-4 (Croley Dep. at 48) (Page ID #403); *see also* R. 44-2 (Bruno Dep. at 46–47) (Page ID #384) (concluding "generally" that the closest spent casing was forty-five feet from Mitchell's body). Although the record does not indicate the exact distance between Schlabach and Mitchell when Mitchell was shot, a reasonable juror could conclude that Mitchell was far enough away that he did not pose an immediate threat to Schlabach. This point is perhaps best articulated by W. Ken Katsaris, a law-enforcement officer and instructor with over thirty years of extensive experience, who stated, "I did <u>not</u> see where Mitchell in any way could conceivably be an immediate threat to the safety of the officer or others. Mitchell was obviously not armed, not threatening Schlabach, and appears to want to avoid the aggressive approach of Schlabach." R. 44-5 (Katsaris Aff. at 9) (Page ID #424).

On this point, the majority once again draws inferences in favor of Schlabach rather than Plaintiff. Recognizing that "the video does not allow for a precise determination of the distance between Mitchell and Schlabach at the time of the first shot," the majority nevertheless concludes that "there is no question that Mitchell showed no signs of stopping and that one more step would have placed Mitchell in a position to attack Schlabach with his fists." Majority Op. at 9. However, because the video does not reveal the distance between Mitchell and Schlabach, a permissible inference to draw is that the two were 21 feet apart, R. 44-4 (Croley Dep. at 48) (Page ID #403), rather than "one more step" away. And whether Mitchell was "charg[ing],"

Majority Op. at 8, or took an "aggressive approach," *id.*, such that he "showed no signs of stopping," *id.* at 9, are the sort of descriptive conclusions that we ordinarily leave to a jury.  I cannot say that there is not a single reasonable juror who would characterize Mitchell's gait as a "walk" rather than a "charge" or "calm" rather than "aggressive."  Katsaris's testimony only bolsters my view that a jury could differ with the majority's characterizations of Mitchell's demeanor and gait.  *See* R. 44-5 (Katsaris Aff. at 9) (Page ID #424).

The majority also dubiously observes that Mitchell "might well have attacked Schlabach with his fists, or . . . might have tried to wrestle for control of Schlabach's gun so that he could use it against the officer."  Majority Op. at 8.  The video does not mandate the majority's inferences.  In fact, Schlabach had a triple-retention holster, which makes it "more difficult for a . . . subject to remove [the] weapon . . . in a struggle."  R. 44-1 (Schlabach Dep. at 79) (Page ID #361).  Most troublingly, it is theoretically possible in every police encounter for an unarmed suspect to wrest control of the officer's gun or to engage in fisticuffs.  To hold that deadly force is warranted because of this ubiquitous possibility undermines the cardinal principle that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Garner*, 471 U.S. at 11.

Third, and in addition to weighing the threat that Mitchell posed to Schlabach, reasonable jurors may consider that Schlabach had less deadly means of subduing Mitchell without using deadly force.  *See Bell v. Cumberland Cty.*, 665 F. App'x 421, 426 (6th Cir. 2016) (considering that the officer "had exhausted all other options," including using pepper spray and a baton).  Schlabach kept a baton in his duty bag, which was in the front passenger side seat.  R. 44-1 (Schlabach Dep. at 76–77) (Page ID #360).  However, he did not remove the baton because, as he put it, "what time do I have to reach around and try to find something[?]"  *Id.* at 77 (Page ID #360).  Schlabach was also armed with and trained to use pepper spray, which he refused to use because he believed that "it would render [him] basically ineffective."  *Id.* at 24 (Page ID #347); R. 44-5 (Katsaris Aff. at 10) (Page ID #425).  As Katsaris observed,

> Officer Schlabach, to compound this, at maximum, physical force encounter, did not carry his baton on his person, preferring to carry it in a bag in his patrol car, and even though Schlabach <u>did</u> have OC Restraint Spray on him, refuses to use it for the fear of being affected by it.  This, of course, leaves Schlabach only the

> lowest level of force, physical control, or the highest level of force, deadly by imposition of his pistol. He chose his pistol, and in my opinion, applying all of the recognized [Michigan Commission on Law Enforcement Standards] training, and training provided for officers similarly situated was objectively unreasonable.

R. 44-5 (Katsaris Aff. at 10) (Page ID #425). Although the availability of less deadly force may be "insufficient" on its own to "render [Schlabach's] use of deadly force unreasonable under these specific circumstances," Majority Op. at 9, a reasonable juror could take such availability into consideration in evaluating the reasonableness of Schlabach's actions. *See Bell*, 665 F. App'x at 426.

Fourth, the majority observes that this is a unique case because Schlabach was "the lone available officer at the time," was located "in the middle of an unpopulated national forest after Mitchell charged toward him in direct defiance of orders to drop to the ground," and did so after an "extended 100-mile-per-hour car chase in the rain." Majority Op. at 9. However, each of these observations once again does not take the facts in the light most favorable to Plaintiff. There is a genuine dispute as to whether Schlabach was alone or isolated in a material way. Two officers arrived on scene within two minutes of Schlabach parking his car, R. 20-1 (Video at 16:41:06–43:04 (Page ID #88), and several additional officers arrived in the twenty minutes thereafter, *id.* at 16:41:06–17:01:00 (Page ID #88). Two passersby came into view within five minutes of Schlabach parking his car. *Id.* at 16:41:06–43:34, 45:22 (Page ID #88). In addition, Schlabach acknowledged that he "was aware that somebody was coming" as backup. R. 44-1 (Schlabach Dep. at 61) (Page ID #356). And although deadly force may be used to stop a car chase in which the suspect "pose[s] an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase," *Scott*, 550 U.S. at 384, the car chase here had ended when Schlabach shot Mitchell. *See* R. 20-1 (Video at 16:41:22) (Page ID #88).

Finally, even if reasonable jurors could conclude that the first shot was warranted, the second shot raises its own set of issues regarding reasonableness. When plaintiffs allege excessive force with respect to multiple shots, "the appropriate method of analysis is to 'carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.'" *Dickerson*, 101 F.3d at 1161 (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th

Cir. 1994)). "When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Id.* at 1162 n.9, *quoted in Mullins*, 805 F.3d at 768. The video depicts Mitchell slowing down and hunching over immediately after Schlabach fired his first shot. R. 20-1 (Video at 16:41:24) (Page ID #88). In addition, the postmortem examination report indicates that "[d]eath occurred almost immediately from rapid exsanguination resulting from right atrial laceration caused by gunshot wound #A" and that "[o]nly minimal traumatic injuries were observed from the motor vehicle crash and gunshot wound #B." R. 20-5 (Postmortem Examination Report at 1) (Page ID #132). A reasonable juror could conclude that Mitchell posed no serious threat to anyone after the first shot, which may have killed him "immediately," *id.*, and which at a minimum visibly slowed him down, *see* R. 20-1 (Video at 16:41:24) (Page ID #88). *See Margeson v. White Cty.*, 579 F. App'x 466, 472 (6th Cir. 2014) ("[A] jury could certainly conclude that shooting at a man 43 times, including at least 12 shots after he had fallen to the ground, amounts to an unreasonable and excessive use of force, under the circumstances described here.").

Altogether, there exist numerous genuine issues of material fact as to "whether the [Mitchell] pose[d] an immediate threat to the safety of the officers or others." *See Mullins*, 805 F.3d at 765. Therefore, I believe that the second *Mullins* factor weighs in favor of Plaintiff.

**B.** **Third *Mullins* Factor: Whether the Suspect Is Actively Resisting Arrest or Attempting to Evade Arrest by Flight**

I also believe that the third *Mullins* factor—whether Mitchell actively resisted arrest or attempted to evade arrest by flight—weighs in favor of Mitchell when the facts are viewed in his favor. As a preliminary matter, the question of evasion is easily answered when viewed in the light most favorable to Plaintiff: although Timothy Mitchell was evading Schlabach during the car chase, as Schlabach states in his brief, "Mitchell was not shot in the back as he evaded arrest by running away from Officer Schlabach." Appellee's Br. at 31.

Thus, the only question is whether Mitchell was "actively resisting arrest" when he was shot. *See Mullins*, 805 F.3d at 765. The facts cast in the light most favorable to Plaintiff show that he was not. As referenced above, Timothy Mitchell was walking toward Schlabach when he was shot. After watching the dash-cam video, reasonable jurors could conclude that Mitchell

was not walking "aggressively" with "[c]lenched fists" and "wide eyes," R. 44-1 (Schlabach Dep. at 95) (Page ID #365), but rather that he was walking calmly toward Schlabach. *See Brown v. Weber*, 555 F. App'x 550, 553 (6th Cir. 2014) (holding that there was not "incontrovertible evidence that" the suspect actively resisted arrest because "the surveillance video [was] ambiguous as to whether [he] took a 'fighting stance'" when confronting the officer). In addition, reasonable jurors could reject Schlabach's contention that Mitchell "told me I was gonna have to fucking shoot him," R. 44-1 (Schlabach Dep. at 91) (Page ID #364), because Mitchell is not alive to contradict this self-serving account of Schlabach. *See Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (declining to credit "what may be a self-serving account by the police officer" (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994))). Mitchell's actions, stripped as they must be of inferences that favor Schlabach, leave us with a situation that is a far cry from cases in which the suspect actively resisted the officer. *See, e.g.*, *Bell*, 665 F. App'x at 426 (holding that there was active resistance because the suspect "pinned [the officer] to the ground, was delivering continuous blows to his head and ribs, and was about to strike him with a cast iron skillet, which would have inflicted serious—if not deadly—harm"); *Davenport v. Causey*, 521 F.3d 544, 551–53 (6th Cir. 2008) (holding that there was active resistance because the suspect delivered "closed-fisted blows" to the officer's head); *Untalan v. City of Lorain*, 430 F.3d 312, 313, 317 (6th Cir. 2005) (holding that there was active resistance because the suspect stabbed an officer with a knife). Therefore, I believe that the third *Mullins* factor favors Mitchell at this stage of the case.

*       *       *

In consideration of these factors altogether, the totality of the circumstances weighs against summary adjudication. Although the first *Mullins* factor favors Schlabach, the second and third factors favor Mitchell. Particularly in a case such as this, where there are numerous statements and pieces of video footage that cast doubt on whether the suspect posed an immediate threat to the officer or others, summary judgment should not dispose of the case. *See Sigley v. City of Parma Heights*, 437 F.3d 527, 534–36 (6th Cir. 2006) (holding that summary judgment was inappropriate where there were genuine issues of material fact as to the second factor). Therefore, I believe that Plaintiff has put forth sufficient evidence that, when viewed in

the light most favorable to him, demonstrate a violation of Timothy Mitchell's constitutional rights.

### III. WAS THE OFFICER'S ACTION CONTRARY TO CLEARLY ESTABLISHED LAW?

I also believe that the case law available at the time of the shooting "gave [Schlabach] fair warning that [his] conduct violated the Constitution" because of the violation's obviousness when viewed in the light most favorable to Ronald Mitchell. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). I fully recognize that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. ——, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). However, and keeping in mind the central inquiry of whether "existing precedent . . . placed the statutory or constitutional question beyond debate," *id.* at 551 (quoting *Mullenix v. Luna*, 577 U.S. ——, 136 S. Ct. 305, 308 (2015)), there are nevertheless some "obvious" cases in which general "standards can 'clearly establish' the answer, even without a body of relevant case law." *Sample*, 409 F.3d at 699 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

This is one such obvious case. "We have held that it has been clearly established in this circuit for the last [thirty] years that a criminal suspect 'ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or to others during flight.'" *Sample*, 409 F.3d at 699 (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)). Specifically, "an officer may not use deadly force to seize a suspect walking towards the police in an enclosed unfamiliar area at night with his hands at his side." *Id.* (citing *Dickerson*, 101 F.3d at 1163). Nor may "an officer . . . use deadly force to effectuate an arrest of an intoxicated suspect at night in an unfamiliar place without a reasonable belief that the suspect posed a significant danger to the officer or others." *Id.* (citing *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998)). It is of no moment that Schlabach was in an unfamiliar place, *see Sova*, 142 F.3d at 903, or that Mitchell was walking towards him, *see Dickerson*, 101 F.3d at 1163. Rather, when cast in the light most favorable to Plaintiff, the facts of that fateful afternoon should have made it obvious to any reasonable officer that Timothy Mitchell, whom Schlabach believed to be unarmed and who was not otherwise dangerous, did not deserve to be met with deadly force.

I do not believe that qualified immunity shields Schlabach from liability under § 1983. Therefore, I would reverse the district court's judgment and remand the case for further proceedings.